UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

YVETTE TURNER                                          PLAINTIFF

VS.                          CIVIL ACTION NO. 3:13CV612TSL-JCG

JACKSON STATE UNIVERSITY;
DR. DANIEL WATKINS, INDIVIDUALLY;
DR. MARK HARDY, INDIVIDUALLY;
DR. JAMES RENICK, INDIVIDUALLY;
DR. CAROLYN MEYERS, INDIVIDUALLY;
AND JOHN DOES 1-10                                    DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

Yvette Turner has brought this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* against her former employer, Jackson State University (JSU), alleging she was "retaliated against by being discharged because she opposed sex discrimination, and because she had filed EEOC charges."[1]  The case is presently before the court on JSU's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has responded in opposition to the motion,

---

[1]  In her original complaint, Turner sued Jackson State University (JSU) and four JSU employees, JSU President Dr. Carolyn Meyers, former JSU Provost Dr. Mark Hardy, JSU Provost Dr. James Rennick and Dr. Daniel Watkins, Dean of the JSU School of Education.  And, in addition to her Title VII retaliation claim, she alleged claims under Title VII and 42 U.S.C. § 1983 for gender discrimination; under § 1983 for constitutional due process and free speech violations; and under state law for intentional infliction of emotional distress.  By memorandum opinion and order entered March 21, 2013, the court dismissed all the claims against the individual defendants.  Plaintiff thereafter filed an amended complaint by which she dismissed all but her Title VII retaliation claim.

and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that the motion is well taken and should be granted.

Facts

Turner was originally employed by JSU during the 1997-98 school year as a program coordinator in the JSU Math/Science Center. She subsequently became employed by JSU as a program assistant for the Institute for Educational Renewal. In 2002, she filed an EEOC charge against JSU alleging sexual harassment, and in 2004, she filed a lawsuit based on that charge. In 2005, while the case was pending, she resigned from JSU and took a teaching position out of state. In 2006, she reached a settlement with JSU in that lawsuit. As part of the parties' settlement agreement, Turner was offered and accepted a position as a tenure track professor in the School of Education commencing with the fall term 2006.

Under applicable policies of JSU and the Mississippi Institutions of Higher Learning, tenure track professors must apply for tenure no later than the sixth year of their tenure track employment. Accordingly, in September 2011, Turner submitted her application for promotion to associate professor with tenure. By letter dated March 9, 2012, then-JSU Provost Dr. Mark Hardy notified Turner that upon review of her application portfolio, he was unable to recommend her for tenure, as she had

2

not met all of the criteria for tenure.  Specifically, the letter recited she lacked "documented funding grants and the minimum number of peer reviewed publications" required for tenure.[2]  Hardy concluded his letter with the following:

> I encourage you to meet with your department chair and college dean to explore alternative employment options with the University, along with referring to the Faculty Handbook for specific procedures related to this recommendation.

On March 23, 2012, JSU President Dr. Carolyn Meyers notified Turner by letter that she had accepted Dr. Hardy's recommendation to deny tenure.  Like Hardy, Meyers advised plaintiff to "seek the advice of your department chair and college dean regarding this decision."

Turner testified that upon receiving Hardy's letter, she immediately went to see Dr. Daniel Watkins, Dean of the College of Education, about the decision to deny her tenure.  According to Turner, Watkins assured her, "Dr. Turner, as long as I'm dean of this college, you will always have a job teaching here."[3]  Turner

---

[2]     Though she does not deny that she failed to satisfy the minimum requirements for tenure, Turner alleged in her original complaint in this cause that the reason she did not meet these requirements is that she was not timely and properly advised as to the requirements; and she alleged that this was done in retaliation for her 2002 EEOC charge.  While she still faults JSU for failing to timely advise her of the minimum tenure requirements, her amended complaint does not allege a retaliation claim on this basis.

[3]     Watkins denies he made any such statement.

3

asserts that after speaking with Watkins, she then went to see Hardy, who told her she could remain at JSU in either a teaching track - presumably as non-tenure track contract faculty - or a research track.[4]  Turner states that at some point, she also had conversations with her department chair, Dr. Corrine Bishop, in which she claims that Bishop "confirmed that she would be recommending me for employment every year."  Turner indicated that what these individuals told her was consistent with what she had observed over her years at JSU, which was that faculty who moved from a tenure track to a non-tenure track continued teaching at JSU.  Thus, she was not alarmed upon being denied tenure; she thought she would continue teaching at JSU in a non-tenure track on a year-to-year contract from that point on.  However, what happened instead was that in October 2012, she was given a "one year only" contract that ran from August 2012 to May 2013; and when that one-year contract expired in May 2013, it was not extended or renewed, and her employment at JSU ended.

In the meantime, Turner did appeal the tenure decision, but her appeal was denied and the decision confirmed.  In addition, on September 13, 2012, Turner filed an EEOC charge, complaining that

---

[4]     Hardy has testified that he does not recall this alleged conversation but that if there was a discussion between them, he likely would have told her about a recently established policy at JSU that allowed for non-tenure track contract faculty, discussed *infra* at 14-15.

she had not been properly advised regarding the requirements for tenure, which she believed was in retaliation for her 2002 EEOC charge of sexual harassment against JSU. Later, in January 2013, she filed an amended EEOC charge, alleging that in retaliation for her EEOC charge(s), she was not being compensated for teaching additional classes and for coordinating certain programs. In June 2013, Turner filed another EEOC charge, complaining that JSU did not allow her to teach summer school. Finally, on August 5, 2013, plaintiff filed an EEOC charge complaining that she was terminated in retaliation for filing the previous EEOC charges. After receiving a notice of right to sue, Turner timely filed the present action on September 30, 2013.

Standard

Where, as here, a plaintiff lacks direct evidence of retaliation, her retaliation claim is evaluated under the McDonnell Douglas burden-shifting framework. See Davis v. Fort Bend Cty., 765 F.3d 480, 490 (5th Cir. 2014) (citation omitted). Under this framework, plaintiff must first demonstrate a *prima facie* case of retaliation by showing "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." Id. (citations and internal quotation marks omitted). "If the employee establishes a *prima facie* case, the burden shifts to the employer to state a

5

legitimate, non-retaliatory reason for its decision.  <u>Id</u>.  After
the employer states its reason, the burden shifts back to the
employee to demonstrate that the employer's reason is actually a
pretext for retaliation."  <u>Id</u>. (citations and internal quotation
marks omitted).

<u>Analysis</u>

In filing EEOC charges, Turner engaged in activity protected
by Title VII.  <u>See</u> <u>Carter v. Target Corp.</u>, 541 Fed. App'x 413, 418
(5th Cir. 2013) (recognizing that a plaintiff who files a complaint
with the EEOC engages in a protected activity).  Moreover, there
is no dispute that she suffered an adverse employment action, as
she was terminated from her employment with JSU.  However, the
parties disagree as to precisely *when* this adverse employment
action occurred; and this disagreement bears directly on the
element of causation.  JSU contends that plaintiff's termination
occurred before she filed her EEOC charges in September 2012 and
that consequently, her termination could not have been in
retaliation for her filing of those charges.[5]  <u>Cf.</u> <u>Ward v. Jackson</u>

---

[5]     Turner's complaint identifies each EEOC charge she
filed, including the 2002 sexual harassment EEOC charge which was
the subject of her previous lawsuit and the settlement by which
she came to be re-employed by JSU in 2006.  She alleges that JSU
"harbored hostility against [her] because she filed previous EEOC
charges and because she opposed illegal sexual harassment" and
states that she would not have been discharged "but for her filing
of the EEOC charge in January 2013, and earlier EEOC charges...."
The court assumes from this that Turner intended to allege that
her termination was in retaliation, not only for her more recent
EEOC charges, but for the 2002 charge, as well.  However, JSU

6

<u>State Univ.</u>, --- Fed. App'x —, 2015 WL 795826, at *1 (5th Cir. Feb. 26, 2015) (recognizing that to establish causation, the plaintiff "must at least demonstrate that prior to her termination, [the defendant] was aware of [the plaintiff's] [EEOC] complaint, because "[i]f an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."). More particularly, citing <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), JSU argues that when an employee is given notice and placed on a one-year "terminal" contract, the adverse employment action occurs (and the limitations period begins to run) when notice of termination is provided, not at the expiration of the contract, even though the *effect* of that notice may not occur until later. It thus maintains that although Turner's termination was not *effected* until May 2013, the adverse employment action that resulted in her termination occurred in March 2012, when Turner failed to meet the minimum requirements for tenure and promotion, received notice that her application for tenure would be denied, and was removed from the tenure track and given a one-year

_____

argues in its motion that the 2002 charge was too remote in time and circumstance to support any reasonable inference of a causal link to her termination. In her response, Turner does not challenge JSU's position in this regard. It is clear to the court that JSU is correct on this issue.

7

terminal contract.  It maintains, therefore, that Turner's claim fails as a matter of law because her EEOC charges were filed *after* the challenged adverse employment action.  Turner, on the other hand, claims that her termination occurred, at the latest, when JSU failed to extend or renew her contract in May 2013, but at the *very earliest*, in October 2012, when she was offered a "one year only" employment contract.  She insists that at the time she filed her September 2012 EEOC charge, not only had she not been terminated but the termination process had not been set in motion, contrary to what JSU contends.  Indeed, she claims that even when her one-year-only contract expired in May 2013, she reasonably expected that she would continue to be employed as a professor at JSU as a non-tenure track professor.

In Delaware State College v. Ricks, the defendant Delaware State College had a policy of not immediately discharging a faculty member who did not receive tenure but rather offering such a person a "terminal" contract to teach one additional year, with the employment relationship to end when that contract expired. 449 U.S. at 253, 101 S. Ct. 498.  In keeping with the College's policy and practice in this regard, on July 26, 1974, when Ricks' tenure application was denied, the College offered him a one-year "terminal" contract, with explicit notice that his employment would end upon its expiration, i.e., that it would not renew his contract at the end of the 1974-75 school year.  Id. at 253-54,

8

101 S. Ct. 498.  In April 1975, Ricks filed an EEOC charge
complaining that the decision to deny tenure was discriminatory.
He thereafter filed suit under Title VII and 42 U.S.C. § 1981
complaining that the denial of tenure and his subsequent
termination were discriminatory.  Id. at 254, 1010 S. Ct. 498.
In considering a challenge to the timeliness of Ricks' EEOC
charge, the Supreme Court concluded that there was only one
alleged unlawful employment practice, the College's decision to
deny tenure, since under the College's policy, "termination of
employment at Delaware State is a delayed, but inevitable,
consequence of the denial of tenure."  Id. at 257-58, 101 S. Ct.
498.  The Court explained:

> [T]he only alleged discrimination occurred–and the
> filing limitations periods therefore commenced–at the
> time the tenure decision was made and communicated to
> Ricks.  That is so even though one of the *effects* of the
> denial of tenure–the eventual loss of a teaching
> position–did not occur until later.  The Court of
> Appeals for the Ninth Circuit correctly held, in a
> similar tenure case, that "[t]he proper focus is upon
> the time of the *discriminatory acts*, not upon the time
> at which the *consequences* of the acts became most
> painful."  Abramson v. University of Hawaii, 594 F.2d
> 202, 209 (1979) (emphasis added); see United Air Lines,
> Inc. v. Evans, 431 U.S., at 558, 97 S. Ct., at 1889.  It
> is simply insufficient for Ricks to allege that his
> termination "gives present effect to the past illegal
> act and therefore perpetuates the consequences of
> forbidden discrimination."  Id. at 557, 97 S. Ct. at
> 1888.  The emphasis is not upon the effects of earlier
> employment decisions; rather, it "is [upon] whether any
> present *violation* exists."  Id. at 558, 97 S. Ct. at
> 1889 (emphasis in original).

Id. at 258, 101 S. Ct. 498.

JSU argues that just as the adverse employment action in Ricks occurred when Delaware State College gave notice to Ricks of his terminal contract by letter and Ricks signed the contract without objection or reservation, the adverse employment action here occurred in March 2012, when JSU gave plaintiff notice that her application for tenure was denied, since Turner knew when she received this notice that she would receive a one-year terminal contract that would end in May 2013; and it notes that Turner knew when she signed the contract for the 2012-13 school year that it was for "one year only" and would end in May 2013.  In the court's opinion, however, the record evidence, construed in the light most favorable to plaintiff, does not entirely support JSU's position.

First, in contrast to Ricks, while Turner was clearly informed in March 2012 that her application for tenure had been denied, she was not explicitly informed at that time that as a consequence, she would be offered a one-year-only contract which would not be renewed at the conclusion of that year.  JSU seems to suggest that plaintiff knew or should have known that she would be offered a one-year terminal contract once her tenure application was denied since that is typically what occurs at JSU when a professor does not attain tenure.  However, according to the JSU Faculty Handbook, there is another option.  The Handbook states, in pertinent part:

> The total period of continuous employment for a
> full-time faculty member at [JSU] eligible for tenure
> consideration and who is not awarded tenure shall not
> exceed six (6) full academic years.  (Faculty members
> must apply for tenure during their sixth year of
> continuous full-time employment [exclusive of leave]).
> Faculty members who are not awarded tenure during that
> time period must be given a one-year terminal contract
> at the end of their sixth year, which expires at the end
> of the seven-year period *or placed in a non-tenure track
> position upon the recommendation of the department
> chair.*

(Emphasis added).  Indeed, although JSU contends that tenure-track

professors who do not attain tenure are *typically* offered one-year

terminal contracts, it admits that this does not occur in every

case and that there are situations in which a professor may remain

employed by JSU after failing to obtain tenure and after the

expiration of his/her terminal contract.  Although JSU has

characterized this as a "rare" occurrence, Turner has claimed in

her testimony that JSU has routinely continued to employ

professors as non-tenured contract faculty for years after denying

them tenure.[6]  Considering all this evidence, it seems that while

it may have been likely, it was not necessarily "inevitable" from

the fact that she was denied tenure that Turner would be placed on

_____

[6]     Plaintiff cites Dr. Laverne Gentry as one of only two
examples of professors who have been denied tenure but remained
employed by JSU on a non-tenure track.  Notably, Gentry, like
plaintiff, has filed numerous EEOC charges against JSU, a fact
which cuts against Turner's claim that she also would have been
retained "but for" her EEOC charge.  The other individual
identified by Turner is Dr. Nanolla Yazdani, who the court
concludes was not similarly situated to Turner.  See *infra* at 19-
20.

a one-year terminal contract and ultimately terminated at the conclusion of that contract.  There was the possibility that she could have been "placed in a non-tenure track position upon the recommendation of the department chair."  Indeed, Turner has claimed that she was assured by her department chair and dean that she could continue to be employed at JSU as a non-tenured professor, notwithstanding the denial of tenure.

There is nothing in the record to show that, in fact, a determination that Turner would be offered only a one-year terminal contract was actually made before the date on which Turner filed her September 2012 EEOC charge.  Instead, what the evidence does show is this:  that in March 2012, Turner was notified she had failed to obtain tenure; that she filed an EEOC charge in September 2012 complaining that the denial of tenure was retaliatory; and that in October 2012, she was notified that she would be offered a one-year-only contract that would expire in May 2013.  In the court's opinion, on this record, it cannot be concluded as a matter of law that the challenged adverse employment action, i.e., Turner's termination, occurred prior to the date on which she filed her EEOC charge.  Rather, consistent with Ricks, her termination occurred, at the earliest, in October 2012, when she was offered and signed the one-year terminal contract.  Given the close temporal proximity between the filing of Turner's September 2012 EEOC charge and JSU's offering her a

terminal one-year-only contract, the court concludes that Turner has presented sufficient evidence to establish a *prima facie* case of retaliation.  See <u>Flanner v. Chase Inv. Servs. Corp.</u>, --- Fed. App'x --, 2015 WL 408602, at *5 (5th Cir. Feb. 2, 2015) (recognizing that "very close" temporal proximity between an employer's knowledge of protected activity and an adverse employment action is sufficient evidence of causality to establish a *prima facie* case of retaliation).

Nevertheless, Turner cannot prevail on her claim in this cause because she cannot show that JSU's proffered legitimate, non-discriminatory reason for her termination is pretext for retaliation.  "An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action."  <u>Haque v. Univ. of Texas Health Science Ctr. at San Antonio</u>, 560 Fed. App'x 328, 333 (5th Cir. 2014) (citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, --- U.S. ----, 133 S. Ct. 2517, 2533-34, 186 L. Ed. 2d 503 (2013)).  "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity."  <u>Id</u>. (citing <u>Long v. Eastfield Coll.</u>, 88 F.3d 300, 308 (5th Cir. 1996)).

JSU asserts that Turner's employment ended in May 2013 because she did not meet the minimum requirements for tenure and

because, once her tenure application was denied, it was required by JSU and IHL policy to place her on a one-year terminal contract unless her department chair recommended her for continued employment and demonstrated a strong justification for retention based on a critical need, which in Turner's case, did not occur. In the court's opinion, Turner has failed to present sufficient evidence to create a genuine issue of material fact as to whether JSU's proffered reason for her termination is pretext for retaliation.

Under the provisions of the JSU Faculty Handbook, all instructional personnel at JSU fall into one of three categories: tenured, tenure-track and non-tenure track.  Plaintiff was re-hired by JSU in 2006 as a tenure-track faculty member.  As stated *supra*, the Handbook mandates that a tenure-track faculty member "must apply for tenure in the sixth year."  The Handbook states:

> Faculty members who are not awarded tenure during [the prescribed] time period must be given a one-year terminal contract at the end of their sixth year, which expires at the end of the seven-year period or placed in a non-tenure track position upon the recommendation of the department chair.

The Handbook provides for non-tenure track faculty, stating:

> The University may enter into renewable contracts, for periods up to four years in length, with non-tenure track faculty members based upon the mission and needs of the institution.  Non-tenure track faculty will be formally evaluated at least annually.  Renewal of a contract is not guaranteed and will be determined at the University's discretion.  Individuals employed in non-tenure track positions have no expectation of

continuing employment beyond the expiration of their
contracts and will not be eligible for consideration for
the award of tenure.

The Handbook also specifically provides:

... A faculty member who is not awarded tenure must
have his/her tenure track contract terminated at the end
of the seventh year of the probationary period, although
he/she may apply for a non-tenure track position through
the normal application process. *The individual cannot
be reappointed to a faculty position after not being
awarded tenure without going through the application
process.*

(Emphasis added).

In her deposition, Turner admitted that from the time she was

denied tenure until sometime after her termination in May 2013,

she did not submit a written application for continued employment,

whether in the form of a formal employment application, or an

email, memorandum or other form of written request to be placed in

a non-tenure track teaching position.  She explained that knew of

"no process that was in place for something like that to occur."

As neither party has presented evidence as to the nature of the

"normal application process" to which the above-quoted Handbook

provision refers, the court is likewise unaware of what the

process required and in particular, whether a written application

was required.  Turner's testified that based on her alleged

conversations with her Bishop, Watkins and - all of whom allegedly

assured her she could continue teaching at JSU notwithstanding the

denial of tenure - she thought she would be moved into a non-

tenure track position and continue teaching at JSU under year-to-year contracts. Given the absence of evidence to show the kind of application that was required in order for an unsuccessful tenure applicant to be considered for a non-tenure track contract position, the court is unable to conclude as a matter of law that plaintiff could not be found to have applied for a position.

However, in addition to requiring an application, the Handbook provided that an individual denied tenure needed "the recommendation of the department chair" in order to be "placed in a non-tenure track position." JSU's witnesses -- including Watkins, Meyers and Provost Dr. James Rennick[7] – all explained that in the case of a tenure-track professor who has been denied tenure, the process for retaining such a professor beyond the expiration of a terminal contract requires, first and foremost, a recommendation from the department chair to the dean of the department, who in turn may recommend to the provost that the professor be offered a non-tenure track contract. JSU has presented evidence to show that in practice, the retention of an unsuccessful tenure application beyond the expiration of their one-year terminal contract occurs only in the "rare" situation when a department chair determines there is a "critical need" to retain the employee and provides a "strong justification" for such

---

[7]    Dr. Hardy was asked to step down as provost in September 2012 and was replaced by Dr. Rennick.

employee to continue in JSU's employment under a non-tenure track contract or contracts.  It contends that Turner's department chair(s) made no recommendation for her continued employment, much less undertook to present a "strong justification" for her retention to satisfy a "critical need."

In this regard, the uncontroverted evidence establishes that in Turner's case, there was never a recommendation by her department chair that she be retained beyond the expiration of her terminal contract.  At the time Turner was denied tenure, Corrine Bishop was the chair of the School of Education.  Turner testified that after being denied tenure, she spoke with Bishop, who "confirmed that she would be recommending me for employment every year."  Even were this statement competent summary judgment evidence,[8] it does not establish, or even purport to establish, that Bishop actually did recommend Turner for continued employment to Dean Watkins.  On the other hand, Dean Watkins has stated affirmatively that Bishop made no such recommendation.

In December 2012, Bishop was removed from her department chair position and Dr. Ingrid Smith became interim chair of the

---

[8]    In addition to arguing that this testimony is not credible - a finding this court is unable and unwilling to make in this summary judgment context -  JSU also objects that Turner's testimony is hearsay and hence not admissible as summary judgment evidence.  See Warfield v. Byron, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes under Federal Rule of Civil Procedure 56).

department.  Turner points out that Smith, when asked in her deposition whether she would have recommended plaintiff to stay at JSU on a year-to-year basis, responded, "I don't have any problems with her."  However, Smith testified that she never asked or recommended to Dean Watkins that Turner be employed after the expiration of her 2012-13 terminal contract.[9]

Moreover, although she purports to have done so, Turner has not shown that any similarly situated employees were treated more favorably.  See Bryant v. Compass Group USA, Inc., 413 F.3d 471, 478 (5th Cir. 2005) (explaining that "[d]isparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation").  Plaintiff contends that unlike her, other unsuccessful tenure applicants who did not engage in Title VII protected activity, namely Dr. Patricia VanDecar and Dr. Nanolla Yazdani, were not given one-year terminal contracts, and that Yazdani remains employed by JSU as a non-tenure contract professor.[10]  She submits that VanDecar, who was denied tenure at

_____

[9]    Turner has not alleged or offered any proof that Bishop recommended her to Dean Watkins for retention, nor has she suggested that Bishop had a retaliatory motive for failing to do so.  However, even if Turner had presented proof to support either scenario, summary judgment would still be in order because the necessary recommendation to offer Turner a non-tenure track position upon the expiration of her one-year terminal contract would have to have come from Smith, as she was the department chair at, and for several months preceding the expiration of Turner's one-year contract.

[10]   Turner also points out that Dr. Jeton McClinton (who had not filed an EEOC charge) applied for tenure the same time she did, and although McClinton's tenure application was denied, she

the same time as she, was not placed on a terminal one-year contract for the 2012-13 school year and thus hypothetically could have continued to be employed by JSU had she not retired in May 2013.  Plaintiff concludes that VanDecar's one-year contract was not a "terminal" contract because, unlike hers, VanDecar's personnel action form (PAF) did not state that the contract was for "one year only" but rather stated only "one year faculty". However, regardless of whether VanDecar's PAF recited that it was for one year "only," the contract was for one year, and like plaintiff's, was set to expire in May 2013.  There is nothing to suggest that VanDecar's contract would have been extended or renewed, or that she would have been hired as non-tenure contract faculty had she not retired.

As to Dr. Yazdani, JSU has presented undisputed evidence that upon being denied tenure, Dr. Yazdani went to his department chair, Dr. Jean Farish-Jackson, and that the two of them together went to Dean Watkins and presented what Dean Watkins determined was a strong justification for his retention[11]; Dean Watkins, in

---

was allowed to apply for tenure again the following year. Plaintiff complains that unlike her, McClinton was given a "second bite at the apple."  However, Turner admits that unlike her, McClinton submitted her initial application for tenure a year early, during her fifth year on the tenure track.  Under applicable JSU policy, she was not required to apply for tenure until her sixth year; and when she applied in her sixth year, her application for tenure was granted.  McClinton plainly is not a proper comparator.

[11]   Dean Watkins has explained that JSU has a psychometry licensing program which under applicable accreditation standards, cannot operate without a licensed psychometrist; and Yazdani is

turn, took the recommendation up the chain of command to Provost
Rennick, who offered Yazdani an employment contract in a new
position.  Clearly, as JSU correctly notes, Turner and Yazdani
were not "similarly situated" as they worked in different
departments, had different supervisors, and performed different
work functions in different academic specialties.  See Lee v. Kan.
City S. Ry., 574 F.3d 253, 259-60 (5th Cir. 2009) (noting that
employees are generally not similarly situated if they have
different supervisors, different work responsibilities, or work
for different divisions of a company).

     In view of all of the foregoing, the court concludes that
Turner has not presented sufficient evidence to create a genuine
issue of material fact on the question whether "but for" JSU's
alleged retaliatory motive, she would not have been terminated.
It follows that JSU is entitled to summary judgment.

     Accordingly, it is ordered that JSU's motion for summary
judgment is granted.

     A separate judgment will be entered in accordance with Rule
56 of the Federal Rules of Civil Procedure.

     SO ORDERED this 9th day of March, 2015.

---

the only licensed psychometrist at JSU.  Moreover, under Yazdani,
the program had grown from a handful students to about 70 students
who, without Yazdani, would not have been able to complete their
programs or receive their licenses and would have potentially be
lost to other universities.  Dean Watkins has further maintained
that there was no such critical need for Turner.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE